UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

SCOTT M. CRAIG,                          )
                                         )
        *Petitioner,*                    )
v.                                       )        No.    1:07-cv-72
                                         )
DAVID MILLS, WARDEN,                     )        Judge Mattice
                                         )
        *Respondent.*                    )


## MEMORANDUM

Scott M. Craig ("Petitioner") is a prisoner confined at Morgan County Correctional Facility in Wartburg, Tennessee. Petitioner challenges his judgments of convictions entered by the Criminal Court of Bradley County, Tennessee for one count of aggravated kidnaping and two counts of aggravated rape. Petitioner was convicted by a jury and received a twenty-year sentence.[1] He bases his instant petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 on claims of denial of his constitutional right to effective assistance of counsel, judicial misconduct, flawed indictment, and double jeopardy. (Court File No. 1).

David Mills ("Respondent"), warden of the facility where Petitioner is housed, filed a motion to dismiss Petitioner's § 2254 petition (Court File No. 6). Petitioner subsequently filed a motion to amend his habeas petition to add a sentencing issue which will be **DENIED** as it is not supported by the proposed amendment (Court File No. 13).[2]

---

[1]     Petitioner originally received a twenty-three year sentence, but upon remand from his direct appeal his sentence was reduced to twenty years.

[2]     In addition, it would be futile to grant the motion to amend as Petitioner has not exhausted any sentencing issue in state court. His failure to exhaust the sentencing issue in state court prevents him from raising the issue in this habeas proceeding. *See Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise

After reviewing the filings of Petitioner and Respondent, the record of the state proceedings, and the applicable law, the Court will **GRANT** Respondent's motion to dismiss (Court File No. 6) and **DISMISS** Petitioner's § 2254 petition (Court File No. 1).

## I.      STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Proceedings in the United States Districts Courts, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the case as justice dictates. After carefully reviewing the applicable materials, the Court finds it unnecessary to hold an evidentiary hearing in this case.

Federal courts review decisions of the state courts pursuant to 28 U.S.C. § 2254(d), which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). That statute generally limits a federal district court's jurisdiction to review habeas claims on the merits. More specifically, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of,

---

a claim on appeal in compliance with state law requirements constitutes a procedural default). The only sentencing issue he raised in state court was on direct review. Petitioner claimed the trial court erred by imposing consecutive sentences and the appellate court reversed the judgement of the trial court concerning the length of Petitioner's sentence for aggravated rape and the consecutive sentencing. Subsequent to being re-sentenced, Petitioner never challenged his sentence. Thus, any sentencing claim would be futile as it would be dismissed as procedurally barred.

clearly established Federal law, as determined by the Supreme Court of the United States"
or (2) "resulted in a decision that was based on an unreasonable determination of the facts
in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)
and (2).

A state court's determination of a factual issue shall be presumed to be correct and
the presumption of correctness can be rebutted only by clear and convincing evidence.
28 U.S.C. § 2254 (e)(1). Credibility findings made by state courts are entitled to the
presumption of correctness. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996),
cert. denied, 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*,
392 F.3d 174 (6th Cir. 2004), *judgment vacated*, 545 U.S. 1151 (2005); *Smith v. Jago*, 888
F.2d 399, 407 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990).

## II.      PROCEDURAL HISTORY

On May 29, 1998, Petitioner was convicted by a jury of one count of aggravated
kidnaping and two counts of aggravated rape. Petitioner was sentenced by the trial court
to eight years for the aggravated kidnaping conviction and fifteen years each for the
aggravated rape convictions. The trial court ordered the two aggravated rape convictions
to be served concurrently with each other, but consecutively to the aggravated kidnaping
conviction, for an effective sentence of twenty-three years.

Petitioner's convictions were affirmed on direct appeal, but the appellate court
reversed the trial court's judgment concerning the length of Defendant's sentence for
aggravated rape and the trial court's order of consecutive sentencing, and remanded the

matter for a new sentencing hearing. *State v. Craig*, 2002 WL 1972892 (Tenn. Crim. App. Aug. 27, 2002)

Petitioner filed a *pro se* petition for state post-conviction relief on July 8, 2003, which was amended by counsel on February 23, 2005 (Addendum No. 6). The post-conviction court conducted an evidentiary hearing and denied relief. The Tennessee Court of Criminal Appeals affirmed the denial of post conviction relief. Permission to appeal was denied by the Tennessee Supreme Court on November 13, 2006. *Craig v. State*, 2006 WL 2161806 (Tenn.Crim.App. Aug. 2, 2006), *perm. app. denied* (Nov. 13, 2006). On March 26, 2007, Petitioner filed the instant § 2254 petition.

## III. FACTUAL BACKGROUND

### A. Trial Facts

The facts which gave rise to Petitioner's convictions are taken from the appellate court's opinion on direct review:

> On July 8, 1997, nineteen-year-old Angela Taylor arrived at work at Jack's Kleen-Rite in Cleveland at approximately 6:50 a.m. The dry cleaner business was scheduled to open at 7:00 a.m. Ms. Taylor was working alone that morning. Within minutes of opening, a male customer walked into the establishment carrying a blue-jean jacket. Per company policy, Ms. Taylor wrote the customer's name, phone number, and the date he wanted his dry cleaning returned on a laundry ticket. He then stated that he had to return to the car to empty the jacket's pockets. As he exited the store, she entered his name and phone number into the computer. The customer's car, a 1982 Camaro, was parked directly in front of the business. She watched as he took the jacket to the car and placed it where she could not see his exact movements. He then returned with the jacket and said, "Now, do me a favor." When she inquired as to the favor, he grabbed her by the wrist and warned, "Now, go to my car and don't scream, don't try to get away." She noted that prior to this, he never flirted or made any "off-handed" comments.
>
> Defendant then led her by the wrist out of the store and into his car. She testified that Defendant had a strong grip on her wrists and she knew that

4

she could not get away. He ordered her to climb in through the driver's side door onto the passenger's seat and she complied. He then climbed into the driver's seat, leaned over and locked her door, and drove away. As they drove, she noticed that Defendant was carrying a knife on his belt. Ms. Taylor begged to be released and returned to the store. Defendant stated to her that he would take her back "when you give me a blow job." When Ms. Taylor refused to unzip his pants, Defendant unzipped them, grabbed the back of her head, and shoved her head down towards the front of his pants. He held her head down and forced her to perform fellatio. He then warned her, "If your head comes up you are dead." Although she continued to beg him to not make her do this, he warned her not to "piss him off." She stated that his tone of voice was very firm and demanding. She testified that she performed the act because she was fearful that Defendant would make good on his threats.

Eventually, Defendant stopped the car on a deserted gravel road. He then stated, "[t]hat's not working," referring to the oral sex, and reached for her shorts. She informed him that she was on her menstrual cycle and was wearing a tampon. Defendant ordered her to remove her shorts, her underwear, and the tampon. Once removed, he threw the tampon out the window. Although she begged him not to force her to have sex, he merely replied, "Don't make me mad." She stated that she was afraid to physically resist for fear that he would hurt or even kill her. Defendant then grabbed one of her arms and pulled her on top of him and penetrated her vaginally. After a short while, he stated, "Well, that's not working either," and forced her to lie down on the driver's side seat. He climbed on top of her and penetrated her again, stopping when he ejaculated.

Defendant then drove to another location, an empty field, and stopped the car. He forced Ms. Taylor to exit the car and begin walking. Defendant explained to Ms. Taylor that his family had controlled him his entire life, and that he had raped her because he wanted to be in control for once. Ms. Taylor testified that she did not attempt to run because she was in an unfamiliar area and she was afraid that he would find her and kill her. While they were standing in the field, he pulled out his knife, placed it to her throat and stated, "I know you are going to tell, so I'm going to kill you." She pleaded for her life and explained that she had a six-month-old daughter at home. After hearing this, Defendant lowered the knife, grabbed her hand, and led her back to the car and drove off. While driving, Defendant apologized for his actions and explained that he just wanted to have control of his life.

As they were driving, Ms. Taylor began to recognize the surrounding area and realized that they were returning to Cleveland, Tennessee. Although she pleaded to be released, Defendant insisted on returning her to her place of

employment. However, as they neared the dry cleaners, they saw her boss's van and a police car parked outside. Defendant then said, "I'm f---ed" and drove away. Ms. Taylor promised Defendant that she would not tell anyone what had happened. Defendant instructed her to tell her boss that she just went for a walk. After traveling a few blocks, he stopped the car, unlocked her door, and instructed her to slam the door when she exited. She complied. Ms. Taylor then asked a woman in a nearby car to drive her back to the dry cleaners so that Defendant could not return and pick her up. When they arrived in front of the dry cleaners, she ran inside and told her boss, Jackie Scoggins, and Officer Hanshaw what had transpired.

Ms. Taylor identified Defendant in court as her assailant. She also identified the knife confiscated from Defendant's possession by police as the weapon Defendant had brandished. On cross-examination, Ms. Taylor admitted that at the preliminary hearing, she stated that when Defendant ordered her to leave with him, his tone of voice was "[n]ot really hateful or anything, just kind of calm." She also admitted that in her statement to police on July 8, 1997, she said when they first entered the vehicle, Defendant told her, "I'm not going to kill you or anything."

Jackie Scoggins, a co-owner of Jack's Kleen-Rite, testified that Ms. Taylor had been a faithful employee for approximately six years. She testified that on July 8, 1997, she stopped at the dry cleaners at approximately 7:30 a.m., while running an errand. When she entered the premises, she found two customers waiting at the cash register. However, after searching the store, she was unable to locate Ms. Taylor. She recalled speaking to Ms. Taylor when she called the store that morning at 7:00 a.m. She became alarmed when she found Ms. Taylor's make-up, glasses, keys, drink, and breakfast on the counter beside the cash register. Ms. Taylor's purse was also sitting behind the partition. Everything else in the store was intact, including the clothes and the money in the cash register. After assisting the customers, she called the police.

Ms. Scoggins also noticed that Defendant's name and a description of an article of clothing to be cleaned was entered into the computer. However, there was no garment matching that description in the laundry basket. She testified that per company policy, an employee must first complete a laundry and cleaners' tag for each customer, which includes the customer's name, phone number, and the item to be cleaned. Then, the employee must enter the customer's information into the computer. She further stated that she did not find a laundry ticket for Defendant. Shortly after police arrived, a lady drove up in a blue car and Ms. Taylor ran into the store. She testified that Ms. Taylor was crying and upset and visibly shaken. While she hugged Ms. Taylor and attempted to calm her down, Ms. Taylor kept saying, "he raped me, he raped me ... [h]im, him. It's on the computer." She testified that prior

to July 8, 1997, Ms. Taylor was a reliable and dependable employee, and that she had never left the store unattended.

Officer David Hanshaw testified that on July 8, 1997, he was dispatched to Jack's Kleen-Rite at approximately 8:13 a.m. to investigate a "missing persons" call. When he arrived at 8:19 a.m., he met Jackie Scoggins. Ms. Scoggins explained that the front desk clerk, Angela Taylor, was missing. She further informed him that Ms. Taylor's personal items remained in the store. Within five to fifteen minutes of his arrival, a woman ran through the door screaming, crying, and very hysterical. He later identified this woman as Ms. Taylor. After calming her down, she told him that she was raped by a male customer and related the events of that morning. Ms. Taylor then informed him that she had entered her assailant's name and phone number into the computer. He retrieved this information from the computer. The time of the entry was 7:01 a.m. Ms. Taylor also gave a description of Defendant's automobile. On cross-examination, Officer Hanshaw admitted that after examining the crime scene, he saw no evidence of a struggle.

Detective John Dailey, Jr. of the Cleveland Police Department testified that he was the lead investigator in this case. He arrived at Jack's Kleen-Rite at approximately 8:25 a.m. to respond to a possible missing persons report. Upon arrival, he learned that Ms. Taylor, the alleged missing person, had returned. He recalled that when he first encountered Ms. Taylor, her hair was disheveled and it appeared that she had been crying. She also appeared very scared and upset. He stated that Ms. Taylor related the events of that morning as told to Officer Hanshaw. He retrieved Defendant's name and phone number from the computer. From this information, officers were able to obtain Defendant's home address. Later that day, Defendant was arrested at his place of employment, Easterly Cabinets. During the arrest, officers confiscated a knife that was strapped to Defendant's right hip. Defendant admitted that he had the knife on him when he stopped at the dry cleaners that morning and that he carried the knife most of the time. Defendant further claimed that he used the knife at work.

Detective Dailey interviewed Defendant. He testified that Defendant claimed that he had taken a jacket to Jack's Kleen-Rite earlier that day. Defendant stated that he flirted with the front desk clerk, made some "lines and comments" and convinced her to leave with him. He claimed that he and Ms. Taylor engaged in consensual sex. Defendant stated that he first met Ms. Taylor on that morning.

On cross examination, Detective Dailey admitted that he took a statement from both Ms. Taylor and Defendant. He further admitted that both statements were fairly consistent with the exception of whether or not there was consent. He testified that he did not see any physical evidence of

bruising on Ms. Taylor. He also admitted that in Ms. Taylor's statement, she never mentioned that Defendant pulled a knife on her and forced her out of the store. Instead, she stated that Defendant grabbed her by the hand and ordered her to follow him out of the store. However, Detective Dailey testified that in his opinion, Ms. Taylor had been forcefully removed from the store because the store was left open, and Ms. Taylor's personal belongings were in plain view.

Doctor John Denman testified that he performed a rape examination on Ms. Taylor on July 8, 1997, at approximately 9:00 a.m. When he first encountered Ms. Taylor, she appeared scared and distraught and was crying, weeping, and obviously disturbed. At the time of the examination, Ms. Taylor was on her menstrual cycle and there was a small amount of menstrual bleeding. However, her cervix was closed. He testified that there were no signs of any external bruising, or any signs of bruising or lacerations in the perineal area. He also examined her throat and found no evidence of bruising or redness. He retrieved tissue samples to prepare semen cultures and performed a pelvic examination to ensure that there were no abnormalities. He further stated that while it is usual in rape cases to see evidence of trauma in the vaginal area, it is not always present. When asked, he further testified that in his opinion, approximately forty percent of rape victims that he has examined have some type of bruising, redness, or markings after the attack. However, he stated that this depends on the method used to commit the act. He further testified that as an ER physician, he has witnessed some patients that feign sexual assault, and that they normally appear very detached, unemotional, and very matter of fact about how things happened. However, these persons were usually not as emotionally distressed as Ms. Taylor.

Defendant testified in his own behalf. He denied kidnapping or raping Ms. Taylor. While Defendant's testimony somewhat coincided with Ms. Taylor's account of the morning's events, he claimed that he and Ms. Taylor willingly left her employment and that they engaged in consensual sex. He denied threatening Ms. Taylor with bodily harm. He testified that while he had a knife on his person that day, it never left its sheath. He further testified that he only uses the knife to perform his job duties at Easterly Cabinets. Defendant then admitted that before he was arrested, officers informed him that he was being charged with kidnapping and rape. Then, they asked if he knew what it was about and he replied, "the only thing that he could think of was the girl that morning."

The State called Lieutenant Danny Chastain as a rebuttal witness. He testified that he served the arrest warrant on Defendant at his place of employment, Easterly Cabinets. He stated that when he placed Defendant under arrest, Defendant did not respond. When asked if Defendant knew

what the arrest was about, he stated, "The girl from this morning." He further testified that he never stated the charges against Defendant at the time of the arrest.

*State v. Craig,* 2002 WL 1972892, 1 -5 (Tenn.Crim.App.,2002).

B.    Post-Conviction Facts

At the post-conviction hearing Petitioner, his mother, Margaret Burris, and trial counsel testified. The facts below are taken from the appellate court's opinion affirming the state trial court's denial of post-conviction relief:

> At the post conviction hearing, Margaret Burris, the petitioner's mother, testified that she hired trial counsel to represent the petitioner on the aggravated rape and aggravated kidnapping charges. She testified that trial counsel stated, "It's [a] fairly easy [case] because it's a 'he said-she said' situation," and trial counsel told her that the outcome depended upon whom the jury believed. According to Mrs. Burris, trial counsel never questioned her regarding the petitioner's mental health. The petitioner had mental health problems in the past, and on one occasion, he tried to commit suicide. Mrs. Burris further testified that during the trial, she saw state's witness Jackie Scoggins, the victim's employer, speak to a juror. She told trial counsel about the occurrence but not the court officers or the court, and to her knowledge, trial counsel did not inform the court.
>
> The petitioner testified that he first spoke with trial counsel three weeks after his preliminary hearing, at which he was represented by different counsel. From this conversation until the petitioner's trial approximately one year later, the petitioner spoke with trial counsel on three or four occasions. The petitioner spoke with trial counsel on the petitioner's court dates, and they corresponded by mail. During these communications, according to the petitioner, trial counsel did not discuss the petitioner's potential testimony or his right not to testify. The petitioner testified that trial counsel led him to believe that he had to testify, and he claimed that trial counsel did not prepare him for his testimony. The petitioner stated that trial counsel never discussed the elements of the crimes, the victim's possible testimony, the state's potential evidence, the state's burden of proof, or the type of jurors desired. In addition, the petitioner testified that trial counsel led him to believe that the jury would not convict him. Had trial counsel explained this information or had he not led the petitioner to expect an acquittal, the

petitioner stated that he "would have jumped at the best deal [the state] could give [him]." [3]

The petitioner further testified that the trial court made comments during the trial that caused the petitioner to believe trial counsel was not prepared. He testified that the trial court stated, "You [, trial counsel,] are convicting your own client." The petitioner did not testify to any other comments made by the trial judge.

The petitioner also claimed that trial counsel failed to interview possible defense witnesses. The petitioner built cabinets for Jack Easterly, the owner of Jack Easterly's Custom Cabinets. The petitioner told trial counsel that Mr. Easterly and Phillip Poorle, another employee of Mr. Easterly's, would testify that the petitioner always carried a knife because he used it "as a tool" while building cabinets.[4] Neither Mr. Easterly nor Mr. Poorle testified at the post-conviction hearing.

In addition, the petitioner testified that he did not suffer from mental health issues at the time of the crime or at the time of trial. However, he suffered from mental health issues approximately "four to five years" before the time of the crime as a result of marital problems. He stated that he was treated twice, once for attempted suicide and the second for a nervous breakdown. The record reflects neither where the petitioner was treated nor a diagnosis. However, the record does reflect that the petitioner had never been declared incompetent or insane.

On cross-examination, the petitioner testified that trial counsel hired a private investigator who interviewed all state witnesses. The investigator also met

---

[3]   At the post-conviction hearing, the petitioner argued that trial counsel was ineffective because trial counsel did not properly discuss the plea offers with him. On cross-examination, the petitioner admitted that trial counsel did discuss the offers on his court dates. He did not testify as to what trial counsel told him regarding the offers. The trial court ruled that trial counsel was not ineffective regarding the handling of the plea issue. The petitioner did not raise this alleged instance on appeal; therefore, it is not before the Court for habeas review.

[4]   At trial, the victim, Angela Taylor, testified that the petitioner forced her from her place of employment into his vehicle. *State v. Scott M. Craig*, [2002 WL 1972892,] at 2. Once inside the vehicle she noticed that he was carrying a knife on his belt. *Id.* After forcing the victim to perform fellatio on him while he drove his vehicle and after penetrating the victim vaginally while the vehicle was stopped on a deserted gravel road, the petitioner drove to another location and made the victim exit the vehicle and start walking to an empty field. *Id.* While standing in the field, the victim stated that the petitioner pulled out his knife, placed it on her throat, and stated, " 'I know you are going to tell, so I'm going to kill you.' " *Id.*[] at 3. The victim pleaded for her life, so the petitioner lowered the knife, and they returned to the petitioner's vehicle. *Id.* Ultimately, the petitioner returned the victim to the vicinity of her place of employment. *Id.*

with the petitioner, and they discussed the witnesses' interviews. The petitioner was not aware of any interviews conducted by trial counsel or the private investigator with the victim, but trial counsel did provide the petitioner with the victim's statement. The petitioner further stated that he remembered trial counsel questioning potential jurors during jury selection. The petitioner claimed that he requested a mental evaluation in his Motion for a New Trial, but he was never evaluated. In addition, the petitioner recognized that both he and the state agreed that the knife belonged to him and was in his possession at the time of the offenses.

At the post-conviction hearing, the state called trial counsel, who testified that he discussed the evidence with the petitioner, discussed the petitioner's testimony with the petitioner, and gave the petitioner copies of discovery. Trial counsel hired Bill Capillo, a private investigator, to facilitate building a defense. Mr. Capillo interviewed the state's witnesses, the victim's co-workers, the petitioner's ex-wife, the petitioner's mother, and the petitioner. Trial counsel viewed the case as a "consent defense case," and he knew that witness credibility was important.

Trial counsel could not remember whether the petitioner recommended Mr. Easterly as a potential witness. He explained that he hired Mr. Capillo to investigate such issues and to interview possible witnesses. He further explained that not calling Mr. Easterly was trial strategy. Trial counsel decided that the petitioner's consistent carrying of a knife was not an issue "that needed to be really dwelled on during the trial." Trial counsel admitted on cross-examination that he did not believe Mr. Capillo interviewed Mr. Easterly, but he reiterated that, in his opinion, consistently carrying a knife did not affect the consent issue.

Trial counsel further testified, regarding the mental health issue, "There was something about mental issues that I wanted to keep out [of evidence] because I felt that Mr. Craig was going to have to testify." He explained that although he could not remember the exact facts, he did not want to provide the state with "ammunition" to attack the petitioner's credibility.

Trial counsel did not remember Mrs. Burris' statement regarding a state witness speaking with a juror. He testified that even if this information had come to his attention, he might not necessarily have reported it to the court.

*Craig v. State,* 2006 WL 2161806, *1 -3 (Tenn.Crim.App.2006) *perm. app. denied*, Nov. 13, 2006.

## IV. ANALYSIS

To obtain habeas corpus relief, Petitioner must show that the state court's adjudication resulted in a decision that involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). As the United States Court of Appeals for the Sixth Circuit has observed, "a federal court may not grant a writ of habeas corpus 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (*quoting Williams v. Taylor*, 529 U.S. 362, 411 (2000)) *cert. denied*, 540 U.S. 1164 (2004). Furthermore, federal courts must defer to state court factual findings, according them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner identifies four issues for habeas review. As explained below, two of Petitioner's issues were not properly presented to the state court, and are thus procedurally barred from habeas review. After reviewing the claims which have been properly exhausted, the Court will address the remaining two claims and explain why they are procedurally barred.

### A. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious. The *Strickland* test requires that a defendant

demonstrate two essential elements: (1) counsel's performance was deficient, *i.e.*, counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, *i.e.*, deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id.* at 687-88.

There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Moreover, counsel's conduct cannot be viewed in hindsight, but must be evaluated for reasonableness within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 689-90. A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996); *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994).

To establish the prejudice prong, Petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), *quoting Strickland v. Washington*, 466 U.S. at 690. "An error of counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Id.* at 691.

In his instant habeas petition, Petitioner raises several alleged instances of trial counsel's ineffectiveness. Petitioner attacks counsel's trial preparation, specifically

claiming counsel failed to adequately confer with him, advise him, and interview possible

defense witnesses. Petitioner's remaining alleged instances of ineffective assistance of

counsel at the trial preparation stage are procedurally barred from habeas review because

they were not raised in the state courts.[5]  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45

(1999) (holding that exhaustion requirement mandates presentation of all claims to state

court through discretionary review process).  Accordingly, the Court will only address those

claims attacking counsel's trial preparation performance that were also raised in the state

court.[6]  In addition to his trial preparation claims, Petitioner contends counsel failed to bring

to the trial court's attention that state witness Jackie Scoggins was seen talking to several

jurors outside the courtroom.

### 1.    Trial Preparation

Petitioner contends his trial attorney failed to meet with and advise him sufficiently

and failed to interview possible defense witnesses.  Petitioner's mother testified during the

post-conviction hearing that she had to call counsel and ask him to meet with Petitioner to

discuss his case.  Petitioner testified that trial counsel only met with him three or four times

prior to trial, did not discuss his potential testimony, did not explain his right not to testify,

did not prepare him for his testimony or the victim's testimony, and never discussed the

---

[5]     The following are the procedurally barred claims attacking counsel's trial preparation that Petitioner has raised in this habeas petition:  (1) failure to form a meaningful and close working relationship with Petitioner; (2) failure to independently investigate any of the circumstances of the case; (3) failure to interview Petitioner carefully; (3) failure to communicate to Petitioner all the evidence against him; (4) failure to determine statutory and non-statutory mitigating circumstances; (5) failure to call witnesses in Petitioner's defense; (6) failure to file meaningful pretrial motions; and (7) failure to object, when necessary, during trial.

[6]     In the state post-conviction proceedings, Petitioner claimed counsel was ineffective for failing to request a mental evaluation but he has not raised that claim in this habeas petition.

14

elements of the crimes, the state's potential evidence, the state's burden of proof, or the type of jurors desired.

Trial counsel testified that he discussed the evidence with the Petitioner, discussed his testimony with him, and gave petitioner copies of discovery. In addition, trial counsel hired a private investigator who interviewed the state's witnesses, the victim's co-workers, and Petitioner, his ex-wife, and his mother. Trial counsel viewed the case as a "consent defense case" and knew that witness credibility was important. Trial counsel testified that he did not believe Mr. Easterly was interviewed, but did not believe testimony by Mr. Easterly that Petitioner consistently carried a knife would have affected the consent issue.

The post-conviction trial court found that counsel's actions of hiring a private investigator who interviewed witnesses, providing the witness statements and victim's statement to Petitioner, and decision not to use Mr. Easterly as a witness did not constitute deficient performance. The appellate court affirmed the trial court's findings, observing that Petitioner had failed to demonstrate that counsel's performance was ineffective or that counsel's actions prejudiced him. Additionally, the appellate court noted that Petitioner did not present Mr. Easterly at the hearing, thus failing to establish that counsel's failure to call Mr. Easterly was ineffective assistance.

Based on the evidence before this Court, the state courts' decision on this claim is reasonable and consistent with federal law. Petitioner did not explain how counsel's advice and consultations were deficient or how the alleged failures prejudiced him. Moreover, Petitioner's failure to present Mr. Easterly as a witness in his state post-conviction proceedings has prevented him from demonstrating that trial counsel was deficient for failing to present him as a defense witness. However, even if counsel was deficient, as

alleged by Petitioner, there is no evidence that he was prejudiced by this alleged deficiency. To demonstrate prejudice, Petitioner must demonstrate there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id*. Such a showing has not been made here. Accordingly, Petitioner is not entitled to habeas relief on his claim that counsel's trial preparation was inadequate.

2. *Trial Counsel's Failure to Report Possible Communication Between State's Witness and a Juror*

Petitioner also contends that trial counsel was ineffective for failing to report communications between state's witness Jackie Scoggins and some jurors. The state appellate court concluded that Petitioner did not establish that he was prejudiced by this claimed deficient performance and denied relief.

At the post-conviction hearing, Petitioner's mother testified that she told defense counsel she observed the last witness who testified for the state, Jackie Scoggins—the victim's employer—on the balcony talking to the jurors, but that information was never brought to the court's attention (Addendum No. 7, pp.6-7). Defense counsel testified he did not recall the situation with the witness talking to the jurors, but if it did happen, there was nothing he felt was actionable. Neither Jackie Scoggins nor any of the jurors testified during Petitioner's post-conviction proceeding.

There is no evidence before the Court regarding the contents of any alleged conversation between the state's witness and the jurors. Assuming *arguendo* that counsel was deficient for failing to report the allegation to the court, Petitioner has not

16

demonstrated such deficiency resulted in any prejudice to him. Petitioner has not shown a reasonable probability that, but for counsel's failure to report the alleged communication, the result of the criminal proceeding would have been different and more favorable. Accordingly, he is not entitled to habeas relief on this claim.

B.    <u>Judicial Misconduct</u>

Constitutional due process requires "a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations and internal quotation marks omitted). Bias is shown where a judge's comments evince "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). General allegations of bias and prejudice, however, are insufficient to establish a constitutional violation. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986). Instead, the judicial expressions of animosity must be "much more than subtle"—indeed, they must be extreme—to evidence bias. *Liteky*, 510 U.S. at 562.

There is no general constitutional rule which prohibits a trial court from commenting on the evidence, *McBee v. Grant*, 763 F.2d 811, 817-18 (6th Cir.1985) (citing *Quercia v. United States*, 289 U.S. 466, 469 (1933)("The privilege of the judge to comment on the facts has its inherent limitations. . . . He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses."), and rarely are judicial rulings by themselves a valid basis for a claim of bias or partiality. *Liteky*,

510 U.S. at 555. Finally, it is presumed that public officials, including judicial officers, have properly discharged their official duties, *Bracy*, 520 U.S. at 909.

To obtain relief, Petitioner must show that the result reached by the state court is not in keeping with the standards in § 2254(d), in that it contradicts the governing law in Supreme Court cases, applies that law unreasonably, or is based on an unreasonable determination of the facts in light of the evidence.

Here, Petitioner claims that in the presence of the jury the trial court made improper and highly prejudicial comments during the testimony of various witnesses, which effectively deprived him of his right to a fair trial. Petitioner was denied relief on this claim on direct appeal. Although Petitioner only specifically references an objection made by the trial court during the cross-examination of Officer David 'Hanshaw, the Court has reviewed all alleged instances of judicial misconduct raised on direct appeal, and will address this claim as it was raised on direct appeal.

### 1. Officer David Hanshaw's Testimony

Petitioner contends that the trial court made improper comments concerning the evidence during the State's direct examination of Officer David Hanshaw. The following colloquy between the witness, prosecutor, defense counsel, and the trial court occurred during the trial:

Prosecutor: Okay. Tell the jury who was there and what happened when Ms. Taylor came back in?
Hanshaw: Okay. Myself, Jackie, and I believe Sergeant Gates was there when she come running in, just run right through the door screaming and crying and then she went right to the back office.
Prosecutor: Well, did she say anything?
Hanshaw: She really didn't say anything to me right there. She was crying, very hysterical.

18

| | |
|---|---|
| Prosecutor: | Do you remember her saying anything to anybody when she first came in? |
| Hanshaw: | The way she was acting it was hard to gather. We had to try to calm her down to get some information from her. |
| Prosecutor: | Officer, in your opinion how would you characterize the victim's demeanor at this time, or state of mind? |
| Hanshaw: | Very, very, not normal. She- |
| Prosecutor: | Was she upset, was she hysterical- |
| Hanshaw: | Upset, traumatic,- |
| Defense Counsel: | I believe he's leading the witness, your Honor. |
| Court: | He is, but he said to begin with she was hysterical when she came in, and crying, and I think that's a pretty good description. |

*State v. Craig*, 2002 WL 1972892, at *5 (Tenn. Crim. App. Aug. 27, 2002). Petitioner also contends the trial court made an improper objection during defense counsel's cross-examination of the officer.

| | |
|---|---|
| Defense Counsel: | And I don't see anything written [i]n your [notes] that show any type of trauma or any type of bruising or anything of that in any nature, and so I'm assuming from what you've testified to you saw no evidence of any bruises on her. Is that a fair statement? . . . |
| Hanshaw: | I really can't remember exactly what she was wearing. |
| Defense Counsel: | All right. But there was nothing about her face, her arms and/or her legs that would let you know- |
| Court: | Asked and answered. You said, "did you see any bruises?" He said, "no." |
| Defense Counsel: | Does the court have any other questions? |
| Court: | Do you have any other questions? |

The Tennessee Court of Criminal Appeals first noted that defense counsel failed to raise an objection to any of these instances during trial and that failure to object or take whatever action is reasonably available to prevent or nullify the harmful effect or error constitutes waiver of the issue on appeal. *Id.* at *7. The appellate court then explained that it could, in its discretion, consider an issue which had been waived upon a finding of

19

"plain error," but that it found no such error. The state court's determination that this claim is waived renders it procedurally barred from habeas review.[7]   However, as explained below, even assuming it is not procedurally barred, Petitioner is not entitled to habeas relief on this claim.

The comments made by the trial court during Officer Hanshaw's testimony were essentially only a reiteration of his testimony and did not amount to an improper comment on the weight of the evidence. Consequently, Petitioner has failed to set forth a cognizable federal constitutional claim. Petitioner has not identified any applicable clearly established Supreme Court precedent, nor has he shown how it was unreasonably applied to his claim of error. The Court fails to see how the trial court's statements, which essentially reiterated Officer Henshaw's testimony, amounts to a due process violation. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2.    Victim's Testimony

Petitioner also complains that the trial court interjected statements that were unnecessary and unduly emphasized the victim's testimony. Petitioner attacks the following statements by the trial court:

_____

[7]      The state appellate court decided these claims on the independent and adequate state ground of waiver, which prohibited the state court from reaching the merits of the claim.   That ruling erects an independent and adequate state procedural bar to prevent this Court from considering those claims. *Coe v. Bell*, 161 F.3d 320, 330 (Tenn. 1998). Consequently, Petitioner is barred by this procedural default from seeking federal habeas review of those claims which were waived by trial counsel's failure to raise an objection during trial. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). An alternative holding by the appellate court does not require a habeas court to disregard the state court's finding of procedural bar. *Id.* at 330. Waiver is an adequate procedural rule; it is regularly followed; and it forecloses habeas corpus review, unless Petitioner can demonstrate both "cause" and "prejudice" for his failure to raise the claim in state court while state court remedies were available, or that a miscarriage of justice will result if the claim is not reviewed. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000). Petitioner has not made a claim or presented any evidence to overcome this procedural bar.

| | |
|---|---|
| Prosecutor: | All right. so why didn't you try to run off or get away from him at this point? |
| Victim: | I didn't know where I was, you know, which way to run, and I was afraid he would find me and then he would kill me. |
| Prosecutor: | Excuse me, I didn't hear you on the last. |
| Court: | She said that she thought if she ran that he would find her and kill her. |
| | . . . |
| Defense Counsel: | Ms. Taylor, my name is Ashley Ownby. I want to ask you some questions, go over a couple of things. I don't want to hit you broadside or anything, I don't want to trick you but I want to go over some of the things you've told Officer Dailey over here. Do you remember the statement you gave him, and I'm assuming prior to coming to trial you've reviewed this statement, haven't you? |
| Victim: | I can't hear you. |
| Court: | Yes, I can't hear you either. You are mumbling. |
| Defense Counsel: | Well, I'm sorry, Judge, I guess I'm the one we need to worry about. |
| Court: | I think so. |
| | . . . |
| Defense Counsel: | Now, was there anything that prompted him to take his knife out of his sheath at that time, ma'am? |
| Court: | That would be asking her for something in his head, wouldn't it? |
| | . . . |
| Defense Counsel: | Ms. Taylor, would it be a fair statement that you made no physical effort to get away from- |
| Court: | I believe that has been asked and answered twice, once by him and once by you. |
| Defense Counsel: | I know Detective Dailey said it, but I don't believe she has said- |
| Court: | All right. Ma'am, did you make any physical effort to get away? |
| Victim: | No. I was afraid he was going to kill me. |
| Court: | Thank you. |

*State v. Craig*, 2002 WL 1972892, at *6.

Petitioner, in effect, contends the above statements, made by the trial court in the

presence of the jury and the trial court's admonishment of counsel outside the presence

of the jury that the way he was questioning the victim was not helping his client, amounted to judicial bias. (Addendum 2, pp. 101-102).

The first statement by the judge was a reiteration of the witness's testimony. Although the trial judge's statements to defense counsel and question to the witness arguably showed frustration and impatience, they do not demonstrate prejudice, much less prejudice of such a degree as to have fundamentally impacted the fairness of the entire trial. Petitioner has supplied nothing from which to conclude that, under the well established law in Supreme Court cases, that the cited instances of judicial conduct resulted in actual prejudice to the defense so as to violate due process.

Accordingly, because the state court's rejection of petitioner's judicial-conduct claim was not contrary to or an unreasonable application of the legal principles contained in Supreme Court cases, it's decision may not be disturbed. Habeas relief is not warranted with respect to this claim.

C.   Procedurally Barred Claims

In his third and fourth claims, Petitioner argues the indictment and his convictions violate the principles of double jeopardy and attacks the indictment is defective for failing to allege the requisite mental state. Although Petitioner essentially raised these claims in his state post-conviction petition (Addendum 6, p. 4), he failed to present any evidence on these claims during his post-conviction hearing, nor were the claims raised on direct or post-conviction appeal. As explained below, Petitioner's claims attacking the indictment and multiple rape convictions will not be considered on this habeas review, as they have never been properly presented to the state courts.

Before a federal court will consider a habeas petition, the petitioner must exhaust all remedies available in state courts. 28 U.S.C. § 2254(b)(1)(A), and (2). Exhaustion requires the petitioner to present his claims in "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Under Tennessee's appellate review process, a defendant has a right to have his claims on appeal initially heard by the appropriate appellate court of Tennessee. After a defendant's claims have been decided in the appellate court, a defendant may file a petition requesting permission to appeal to the Tennessee Supreme Court.

Failure by a defendant to present a claim in his appeal to the appellate court will result in a procedural default of that claim if it is later raised in a habeas petition. *See Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002), *cert. denied*, 540 U.S. 839 (2003). Federal courts may only consider claims that have not been properly presented to the state court if the petitioner demonstrates cause and prejudice for the procedural default, or establishes that the failure of the federal court to reach the merits will result in a fundamental miscarriage of justice. *See Gray v. Netherland*, 518 U.S. 152 (1996).

Petitioner has failed to demonstrate cause for his procedural default or any prejudice that resulted from the default. Additionally, there is no allegation or proof that a miscarriage of justice will result from enforcing the procedural default. Therefore, the merits of Petitioner's claims of faulty indictment and double jeopardy will not be addressed here. Accordingly, Respondent's motion to dismiss Petitioner's faulty indictment and double jeopardy claims will be **GRANTED** (Court File No. 6).

## V.      CONCLUSION

Having considered both parties' pleadings together with the state court record, and for the reasons explained above, the Court finds no basis on which to grant the writ of habeas corpus.  It will, therefore,  **GRANT** Respondent's Motion to Dismiss (Court File No. 6) and will **DISMISS** Petitioner's habeas petition (Court File No. 1).

A separate judgment will enter.

_____/s/Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE
